UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
DAHMEEK McDONALD,

                    Plaintiff,

    -v-                                        1:18-CV-1327

CITY OF TROY and JARROD ILER,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                           OF COUNSEL:

LAW OFFICE OF MARK S.                  MARK S. MISHLER, ESQ.
    MISHLER, PC
Attorneys for Plaintiff
744 Broadway 2nd Floor
Albany, New York 12207


OFFICE OF RICHARD T. MORRISSEY   RICHARD T. MORRISSEY, ESQ.
Attorneys for Defendants
64 Second Street
Troy, New York 12180


FITZGERALD MORRIS BAKER          JOHN D. ASPLAND, ESQ.
    FIRTH, P.C.
Attorneys for Defendants
68 Warren Street
Glens Falls, New York 12801


DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

On August 15, 2017, plaintiff Dahmeek McDonald ("McDonald" or "plaintiff") was shot by defendant Jarrod Iler ("Iler"), a police officer employed by defendant the City of Troy ("Troy" or the "City" and collectively "defendants"), while Iler was attempting to place him under arrest. That fact is undisputed. Whether that shooting was legally and constitutionally appropriate, however, is somewhat more contentious.

To get to the bottom of that question, McDonald brought a complaint in this district on November 12, 2018, alleging six total counts against defendants: (I) excessive force against Iler in violation of the Fourth and Fourteenth amendments under 42 U.S.C. § 1983 ("§ 1983"); (II) another § 1983 claim against Iler for a violation of plaintiff's right to Equal Protection under the Fourteenth Amendment; (III) a claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) to attribute any eventual liability from his § 1983 claims against Iler to Troy; (IV) assault against both defendants under New York common law; (V) battery against both defendants under New York common law; and (VI) negligence against both defendants under New York common law.[1]

---

[1] Plaintiff's complaint lists both battery and negligence as his fifth cause of action. For clarity, the Court will consider plaintiff's negligence claim as Count VI.

On February 26, 2021, defendants moved for summary judgment under Federal Rule of Civil Procedure ("Rule") 56 against McDonald's complaint in its entirety. That motion, having been fully briefed, will now be decided on the submissions and without oral argument.

## II.  **BACKGROUND**

By his own admission, McDonald spent much of the early months of 2017 on the run from the police.[2]  *See* Dkt. 22-2, Defendants' Statement of Material Facts ("DSMF") ¶ 117, 119.  Apparently, plaintiff had been released on parole for a felony drug charge in the spring of that year, but for whatever reason he had stopped calling in to his parole officer and removed his monitoring bracelet.  *Id.* ¶¶ 117-18.  His parole officer naturally did not take kindly to that, and for four or five months leading up to August of 2017 plaintiff was hounded by the authorities.  *Id.* ¶ 119.  The authorities' efforts to recapture plaintiff proved less than successful, and plaintiff estimates that he dodged ten total attempted arrests.  *Id.* ¶ 120.

On August 15, 2017, McDonald's game of cat-and-mouse with the authorities took a dark turn.  That evening, Troy Police Department ("TPD") officers Iler and Martin Furciniti ("Furciniti"), were out on patrol for an overtime shift.  DSMF ¶¶ 36-37, 90-91.  Iler, a white person, was driving

---

[2] The facts are taken from defendant's statement of material facts where admitted by plaintiff, or from other record evidence.  Disputed facts are flagged and supported by citations to either the proponent's statement of material facts or to record evidence.

their patrol car when he received a call on his cell phone.  *Id.* ¶¶ 5, 38, 91.
On the other end of the line was Parole Officer Alex Rosa ("Rosa"), who
alerted Iler that a confidential informant had spotted plaintiff in a white
SUV in the area of 8th Street and Rensselaer Street in Troy.  *Id.* ¶¶ 39, 92.
According to Rosa, he called Iler's cell phone rather than using the radio
because plaintiff had taken to monitoring police radio traffic to avoid
recapture.  *Id.* ¶ 40.

   Iler and Furciniti arrived at the intersection Rosa had described, and saw
a white Honda CRV parked on the east (or left from the driver's point of view)
side of the street.  DMSF ¶¶ 47-48.  Furciniti noticed three black males in the
vehicle.  *Id.* ¶ 96.  One of them, as it turns out, was plaintiff.  *Id.* ¶¶ 55,
121, 124.  Iler pulled up in front of the CRV at a forty-five-degree angle.[3]
*Id.* ¶ 50.  Iler's explanation for taking that angle is somewhat confusing, but
in an attempt to reconcile his statements about that decision, he claims he
wanted to "show for that vehicle not to go anywhere at that time" but was not
actively trying to prevent the CRV from leaving.  *Id.* ¶¶ 51-52.  Rather, he
apparently only wanted to signal an intent to interview the occupants.
*Id.* ¶ 52.

---

[3] Plaintiff had parked on a one-way street running to the south.  Dkt. 22-4, p. 224.  As best the
Court can glean, Iler and Furciniti must have pulled up in front of the CRV against traffic.

McDonald had been relaxing in the CRV with some friends for much of the afternoon. *See* DSMF ¶¶ 127-31.  Several of plaintiff's friends had gathered around the car after he had parked it and he had sat fully reclined in the driver's seat while he talked to them for the past hour or so.  *Id.* ¶¶ 131, 133.  Meanwhile, the CRV was parked and shut off, but the keys remained in the ignition.  *Id.* ¶ 133.  One of plaintiff's friends had parked behind his car, but there were no vehicles immediately in front of it.  *Id.* ¶¶ 134-136.

Iler and Furciniti got out of their patrol car, and Furciniti began approaching the CRV's passenger.  *See* DSMF ¶ 99.  Furciniti directed the person sitting in plaintiff's passenger seat to show him his hands and the passenger complied.  *Id.* ¶¶ 100-01.

The parties do not dispute that everything that happened next took mere seconds.  McDonald started the CRV.  DSMF ¶ 141.  In response Iler, who had been approaching the "front center" of the car, repeatedly ordered plaintiff to shut the vehicle down.  *Id.* ¶ 58.  At the same time, he began to draw his duty weapon.  *Id.* ¶ 59.  Meanwhile plaintiff put the CRV in reverse and backed up a short distance without hitting the cars behind him.  *Id.* ¶ 144.

McDonald put the car in drive, turned the wheel all the way to the right, and hit the gas.  DSMF ¶ 145.  According to plaintiff, he intended only to drive around Iler's car to escape capture.  *Id.* ¶ 146.  From Iler's perspective,

5

though, he claims that he believed plaintiff was going to run either himself or Furciniti over. *Id.* ¶ 63. For his part, Furciniti was standing by the trunk of the patrol car when the CRV lurched into motion. *Id.* ¶ 104. Iler was standing near the curb with no obstacle preventing him from stepping to his right and onto the curb. Dkt. 25-1, Plaintiff's Statement of Material Facts ("PSMF"), ¶¶ 176-78.

The instant Iler realized McDonald had started moving toward him and Furciniti, Iler fired on plaintiff, aiming for plaintiff's "upper mass area." DSMF ¶¶ 63-64. Iler fired four times without moving his feet. *Id.* ¶¶ 66-67. One bullet landed in plaintiff's left arm, and he also suffered graze wounds to his head and ear. *Id.* ¶ 154.

Iler claims that when he fired the first shot, the car had been heading directly for him, but by the time he fired the fourth, the CRV had changed its course to miss him to his left. DSMF ¶¶ 68-69. Once Iler realized the car would not hit him, he stopped firing. *Id.* ¶ 70. The CRV drove past Iler and hit the curb on the opposite side of the street from where he had parked. *Id.* ¶¶ 72-73. The entire series of events from Iler exiting his car to his firing his first shot took roughly three or four seconds. *Id.* ¶ 65. Iler's four shots took fewer than two more. *Id.* ¶ 71.

When Furciniti heard the shots being fired, he ran back to duck behind the trunk of the patrol car. DSMF ¶ 106. Once the gunshots ceased,

Furciniti approached the CRV, handcuffed plaintiff's passenger, and stayed with him near the car.  *Id.* ¶¶ 112-13.

Meanwhile, McDonald had jumped out of the CRV and Iler directed him to get on the ground.  DSMF ¶¶ 150, 152.  Plaintiff was apparently confused given his injuries.  *See id.* ¶¶ 153-54.  Accordingly, plaintiff questioned why Iler had shot at him, but nevertheless got down to the ground. *Id.* ¶¶ 153, 155.  Iler got one cuff on plaintiff's right hand, but apparently plaintiff then began to "resist" by trying to push off the ground, escape from Iler, and generally fight being handcuffed.  *Id.* ¶¶ 78, 114, 156.  Plaintiff began screaming that he was going to die, and Iler needed to reassure him that he would be alright, but that he needed to relax.  *Id.* ¶¶ 79-80, 157.

In the process of McDonald's panic, he had found himself underneath the patrol car's bumper.  DSMF ¶ 81.  Iler nevertheless got plaintiff handcuffed and deposited him belly-down away from the patrol car's exhaust pipe. *Id.* ¶¶ 81-82.  Not long after that, one of McDonald's friends and Iler finally succeeded in calming plaintiff.  *See id.* ¶ 158.  Iler reported the incident to his supervisor, then took plaintiff to Samaritan Hospital for examination at the supervisor's direction.  *Id.* ¶¶ 85-86.

Perhaps understandably, McDonald began to contemplate this lawsuit very shortly after his shooting.  His first step in bringing his claims to life was to file a Notice of Claim against Troy on October 4, 2017.  Dkt. 22-4,

7

pp. 454-56.[4]  As was its right, the City promptly demanded a hearing concerning plaintiff's claims under New York General Municipal Law § 50-h ("§ 50-h").  Dkt. 22-4, pp. 458.

McDonald responded that he could not attend the original hearing date of November 2, 2017, because, as a careful reader will anticipate, his parole had been revoked and he was incarcerated at the time.  Dkt. 22-4, p. 459. Accordingly, plaintiff asked that the hearing be rescheduled.  *Id.*  The City adjourned the § 50-h hearing, and signaled a willingness to reschedule it, but—apparently in accordance with its official policy—the City demanded that the hearing take place at its city hall.  *Id.* at 460, 462.  Plaintiff never responded to the City's position, and he never participated in a § 50-h hearing.  *Id.* ¶¶ 461-62.

On November 12, 2018, McDonald filed a complaint against Iler and the City.  Dkt. 1.  In addition to individual claims against Iler, plaintiff brought § 1983 claims against the city relying on the theory of liability the Supreme Court established in *Monell*.  *Id.* ¶¶ 111-12.  On February 26, 2021, defendants moved for summary judgment against McDonald's complaint under Rule 56.  Dkt. 22.  Plaintiff opposed that motion, and this decision now follows.

---

[4] Pagination Corresponds with CM/ECF.

## III.  <u>LEGAL STANDARD</u>

Summary judgment under Rule 56 is warranted if the parties' submissions show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing FED. R. CIV. P. 56(a)).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute of a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  The movant bears the burden of pointing the court to the materials that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Additionally, a court considering a summary judgment motion "must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party." *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citing *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)).  Even so, a non-movant's conclusory allegations without support from record evidence are insufficient: the non-movant must "put up or shut up." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).  At bottom, summary judgment tasks the Court with assessing the assembled evidence and determining whether a reasonable factfinder could find in the

nonmovant's favor.  *Treglia v. Town of Manlius*, 313 F.3d 713, 719

(2d Cir. 2002).

## IV. <u>DISCUSSION</u>

Both defendants have moved for summary judgment against all six of

McDonald's claims against them.  The analysis for his claims against Iler

individually and against Troy as a whole involve a decidedly different

analysis, thus the Court will consider plaintiff's claims against each

defendant separately.

### A. <u>Iler</u>

Nominally, McDonald brings three claims concerning Iler's use of force on

August 15, 2017: (1) excessive force in violation of the Fourth Amendment;

(2) assault under New York common law; and (3) battery under New York

common law.  Functionally, though, all three claims are governed by common

facts and are largely subject to common analysis.  *See Boyler v. City of*

*Lackawanna*, 287 F. Supp. 3d 308, 326 (W.D.N.Y. 2018) ("Except for § 1983's

requirement that the tort be committed under color of state law,[5] the

elements for a claim of assault and battery against law enforcement officers

under New York law and a claim of excessive force under § 1983 are the

same." (cleaned up)).  The Court will thus consider them together as to Iler.

---

[5] The parties do not dispute that Iler was acting under color of state law when he shot plaintiff.

Plaintiff's Equal Protection and negligence claims, however, will be assessed individually.

## 1. **Excessive Force, Assault, and Battery**

The Fourth Amendment protects a free citizen from excessive force in the course of an arrest or investigatory stop. *Cugini v. City of N.Y.*, 941 F.3d 604, 612 (2d Cir. 2019). Of course, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Thus, the excessive force question ultimately boils down to whether the police officer's use of that force was reasonable. *See id.* As a consequence, assessing the reasonableness of a use of force "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (internal citation and quotation marks omitted).

In sum, the reasonableness of an officer's use of force is case-specific and turns on three factors: (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Cugini*, 941 F.3d at 612 (cleaned up). Those factors must be

assessed objectively "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

As might be expected, deciding the reasonableness of an officer's use of *deadly* force is subject to its own unique rules.  To the point, "[i]t is not objectively reasonable for an officer to use deadly force to apprehend a suspect unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29, 36 (2d Cir. 2003) (internal citations omitted).  The officer's mindset is measured by "the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force." *Cowan ex rel. Est. of Cooper v. Breen*, 352 F.3d 756, 762 (2d Cir. 2003).

Those last two points of law drive straight to the heart of the matter in this case.  The parties dispute whether Iler had probable cause to believe that McDonald posed a danger when he drew his service weapon and opened fire. And to each party's credit, a reasonable juror could conclude in their favor.  A juror could look at plaintiff's sharp and sudden maneuver in backing up then shifting the CRV into drive towards Iler and Furciniti, decide that plaintiff's conduct afforded Iler probable cause that plaintiff posed a danger to him and his partner, and find Iler's conduct justified.  DSMF ¶¶ 63, 144-45.

12

But a reasonable juror could just as easily consider that Iler had room and time to get out of the way, reacted before he had a clear idea of any harm McDonald could have posed, and acted unlawfully by firing on plaintiff. DSMF ¶¶ 63-65; PSMF ¶¶ 176-78.  In other words, the parties' diverging narratives establish a dispute of fact that only a jury can answer.  As a consequence, defendants' motion for summary judgment as to plaintiff's claims of excessive force, assault, and battery against Iler must be denied. *See, e.g.*, *Cowan*, 352 F.3d at 758-59, 762-63 (denying summary judgment where police officer fatally shot driver of car because parties disputed whether driver actually posed threat to officer).

### a. **Qualified Immunity**

Anticipating the possibility that summary judgment on the merits would not necessarily dispose of plaintiff's § 1983 excessive force claim, Iler argues in the alternative that his defense of qualified immunity compels summary judgment in his favor.  "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Brown v. City of N.Y.*, 862 F.3d 182, 190 (2d Cir. 2017) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  The test for whether to apply qualified immunity on summary judgment asks two questions: (1) does the evidence, "viewed in the light most favorable to the plaintiff, make[ ] out a violation of a

statutory or constitutional right"?; and (2) was that right "clearly established at the time of the alleged violation"? *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010).

A plaintiff's right is clearly established if "every reasonable official would have understood that what he is doing violates that right." *Brown*, 862 F.3d at 190 (cleaned up).  Rights can become clearly established through the decisions of the Supreme Court and the Circuit Courts of Appeals, *Cugini*, 941 F.3d at 615, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  Further, whether a right is clearly established is a case-specific inquiry not to be defined at a high level of generality.  *Id.* at 742; *Brown*, 862 F.3d at 190.

Even so, a law enforcement officer can only prevail on summary judgment relying on qualified immunity if "the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendant's conduct under the circumstances." *Cugini*, 941 F.3d at 615 (cleaned up).

Contrary to Iler's hopes, his defense of qualified immunity does not require summary judgment in his favor.  After all, the Second Circuit has unambiguously held that the "clearly established" label applies to the use of deadly force to stop a fleeing motorist in the absence of a significant threat of

14

death or serious physical injury to the officer or others.  *See, e.g.*, *Thevenin v. French*, --- F. App'x ---, 2021 WL 961081, at *2 (2d Cir. Mar. 15, 2021) (citing *Cowan*, 352 F.3d at 764).

Defendants may nevertheless argue that this language conflicts with the Supreme Court's demand for specificity in defining what rights are clearly established, but any such conflict is irrelevant in this case.  *See Mullenix v. Luna*, 577 U.S. 7, 12-14 (2015) (reversing denial of qualified immunity because circuit court considered it clearly established that police officer may not "use deadly force against a fleeing felon who d[id] not pose a sufficient threat of harm to the officer or others").

The facts of this case simply line up too squarely with the facts in *Cowan*. Both involve an officer firing on an approaching vehicle within a short window of time.  *Cowan*, 352 F.3d at 758-59; DSMF ¶¶ 65-67.  Both cases involve an officer trying to verbally stop a would-be escapee from fleeing before opening fire.  Cowan, 352 F.3d at 758-59; DSMF ¶ 58.  Both cases involve a dispute as to whether the officer was actually in danger when he opened fire.  *Cowan*, 352 F.3d at 758-59.

In short, the factual underpinnings of this case and *Cowan* are strong enough that, at the very least for the purposes of summary judgment, the Court is satisfied that Iler is not entitled to qualified immunity on his excessive force claims.  *See, e.g.*, 352 F.3d at 765 (affirming denial of

summary judgment on issue of qualified immunity).  Iler's motion for summary judgment against plaintiff's § 1983 excessive force claim on the basis of qualified immunity must therefore also be denied.

### 2. **Equal Protection**

However, McDonald's complaint is as interested in the motivation behind Iler's use of force as it is the justification for that force in a vacuum. Accordingly, plaintiff has also brought an Equal Protection claim, arguing that Iler's use of excessive force was motivated by plaintiff's race and by extension constitutionally impermissible for this alternate reason.

To that end, the Fourteenth Amendment of the United States Constitution prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  The core purpose of the Equal Protection Clause is to prevent "official conduct discriminating on the basis of race[.]"  *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012).

In a practical sense, proving an equal protection claim tasks a plaintiff with proving that "(1) the person, compared with others similarly situated, was selectively treated[;] and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race . . . ."  *Hu v. City of N.Y.*, 927 F.3d 81, 91 (2d Cir. 2019).  In other words, the plaintiff must prove not only that he was treated differently, but

16

that he was treated differently specifically for an impermissible purpose, in this case race.  *See id.*

The nub of McDonald's argument is that Iler shot him on August 15, 2017, because he is an African American.  As Iler points out, plaintiff's support on that front is sparse, but comes from three sources.  First, plaintiff testified at his deposition that it is his experience that African American men in his neighborhood are subjected to acts of violence by police with frequency. Dkt. 22-4, pp. 407-08.

Even setting aside that McDonald's deposition testimony does nothing to suggest that Iler had a discriminatory purpose in shooting him (more on that later), plaintiff's testimony hurts his Equal Protection claim more than it helps it.  When plaintiff was asked why Iler shot at him, plaintiff responded "I can't give you a reason, sir.  The only reason I can give you is basically because they couldn't catch me or whatever."  *Id.* at 408.  In other words, although plaintiff's depiction of the African American experience in Troy may permit some inferences of an impermissible racial flavor to police experiences generally, when the time came for plaintiff to answer why he believed Iler acted the way he did, his response had nothing to do with Iler's own racial motivations.  In that context, plaintiff's testimony provides precious little support for his Equal Protection claims because it does nothing to pin an impermissible motive on Iler himself.

17

McDonald's second basis for arguing that Iler violated his Equal Protection rights reads like an attempt to grapple with that exact difficulty. Specifically, he argues that if a jury were to conclude that Iler was not justified in believing that he and Furciniti were in danger when plaintiff began to drive, the jury would be entitled to make the inference that plaintiff's race would step in to fill the void.

The problem with this argument, though, is that even if the jury were to find against Iler, that would not require the jury to find that he did not believe that he or Furciniti were in danger.  Rather, the jury would only have to conclude that his belief that he was in danger was not a reasonable one. Obviously, because the Court denied summary judgment against McDonald's excessive force claims, there is record evidence to support that conclusion as discussed above.  There is no such evidence to support the conclusion that Iler did not actually believe that plaintiff posed a danger when he drove towards Iler and Furciniti, and plaintiff's second argument does not inspire much confidence in plaintiff's Equal Protection claims.

Alternatively, McDonald's argument could be read to suggest that Iler's use of force was so patently unreasonable that plaintiff's race is the only explanation for his determination that he was in danger.  Perhaps if the reasonableness of Iler's use of force were not a close question, that argument might have had some weight.  But this case presents a close jury question as

to whether Iler acted reasonably, so the likelihood of a jury being so repulsed by his conduct as to read implicit racial bias into it is slim.

That leaves the Court with only McDonald's third argument to buttress his claim of an Equal Protection violation.  Namely, plaintiff points to statistics regarding the heightened likelihood that an African American will experience violence at the hands of police.

That argument also carries precious little weight.  The Supreme Court and Second Circuit have both had their say on the viability of statistics to support an Equal Protection claim.  The Supreme Court has held that statistics must present a "stark" pattern to support an inference of discrimination in the absence of other evidence.  *McCleskey v. Kemp*, 481 U.S. 279, 293 (1987).  Even then, that Court has only acknowledged statistical evidence to support two types of claims: (1) claims attacking the jury selection process; and (2) Title VII claims.  *Id.* at 294.  The Second Circuit has similarly held that to support an Equal Protection claim using only statistics, "the statistics must not only be statistically significant in the mathematical sense, but they must also be of a level that makes other plausible non-discriminatory explanations very unlikely."  *Burgis v. N.Y. City Dep't of Sanitation*, 798 F.3d 63, 69 (2d Cir. 2015).

The statistics that McDonald points to are certainly harrowing, and the Court does not turn a blind eye to the disproportionate outcomes suffered by

African Americans in interactions with police.  However, the reasons undergirding the Second Circuit's and the Supreme Court's decisions firm the Court's resolve that those statistics are still not enough.

McDonald ultimately has the burden of proving that Iler acted with "discriminatory purpose" in firing on him.  *See McCleskey*, 481 U.S. at 292. As compelling as those statistics are, they are not enough to allow a reasonable factfinder to come to the conclusion not only that Iler as an individual acted in a way that perpetuates a discriminatory impact, but that Iler acted with discriminatory intent.  *See United States v. City of Yonkers*, 96 F.3d 600, 611 (2d Cir. 1996) (noting that Equal Protection claim must show both disproportionate or discriminatory impact and intent to discriminate).  Nor are they so powerful that they render Iler's explanation of a good faith—although potentially unreasonable—belief that plaintiff posed a danger "very unlikely." *Burgis*, 798 F.3d at 69.

Accordingly, and even taking all of the arguments McDonald has assembled and presenting them against the backdrop of plaintiff's statistical evidence, no reasonable jury could conclude that Iler had a discriminatory purpose when he shot plaintiff on August 15, 2017.  The only evidence plaintiff has brought that grapples with Iler's personal intent is his own testimony that Iler wanted to shoot him because of his escape attempts, not his race.  Dkt. 22-4, pp. 407-08.  Every other piece of evidence only goes

toward other people's experiences with other police officers.  That evidence

cannot be enough to carry plaintiff past summary judgment, and defendants'

Rule 56 motion must be granted as to Iler on Count II of plaintiff's complaint.

*See, e.g.*, *Milfort v. Prevete*, 922 F. Supp. 2d 398, 410 (E.D.N.Y. 2013)

(dismissing equal protection claim alleging plaintiff was arrested only on

basis of race in absence of evidence of impermissible bias).

### 3. **Negligence**

McDonald's final claim against Iler sounds in negligence, but again turns

only on his shooting plaintiff on August 15, 2017.  To that end, although a

plaintiff is typically "permitted to plead different causes of action in the

alternative, other District Courts in this Circuit have held that when a

plaintiff's factual allegations are only consistent with a theory of intentional,

or perhaps reckless, conduct, negligence claims must be dismissed." *Rizk v.*

*City of N.Y.*, 462 F. Supp. 3d 203, 229 (E.D.N.Y. 2020) (internal quotation

marks omitted) (collecting cases).  Following that general rule, excessive force

claims premised on allegedly intentional conduct are typically not permitted

to coexist with claims of common negligence.  *Warr v. Liberatore*,

270 F. Supp. 3d 637, 655 (W.D.N.Y. 2017).

This case is no different from any other.  Iler could not have negligently

unholstered his firearm, negligently aimed it at McDonald as he began to

drive forward, or negligently pulled the trigger four times in quick succession.

21

DSMF ¶¶ 59, 63-67, 71.  Those actions were intentional, and in any case if a jury were to find that Iler did breach a duty of care, it would necessarily entail a finding that he breached his duty as a police officer to use only reasonable force.

In other words, under no set of circumstances could the evidence in this case support a finding of negligence.  McDonald must therefore prevail on his excessive force, assault, and battery claims or else he must walk away empty-handed.  Defendants' motion for summary judgment as to plaintiff's Count VI claim of negligence must be granted.  *See, e.g.*, *Rizk*, 462 F. Supp. 3d at 229 (granting summary judgment against negligence claims because plaintiff could not prove negligence that would not amount to intentional tort).

## B. **The City of Troy**

Having settled the viability of McDonald's claims against Iler, the Court now considers Troy's unique defenses as to its own liability.  The City attacks the complaint along two fronts by arguing that: (1) plaintiff has failed to establish the City's liability under *Monell* as a matter of law; and (2) plaintiff never attended a § 50-h hearing, and thus his state law claims against the City are forfeited under New York General Municipal Law § 50(i).

### 1. *Monell* Liability

To defendants' point, § 1983 does allow for a municipality to be held liable for the acts of its employees, but only under a limited set of circumstances. *See Monell*, 436 U.S. at 690-91.  Unlike the typical case, in which an employer can be held liable based on the tried and true doctrine of *respondeat superior*, § 1983 requires that the plaintiff "demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury[.]" *Lucente v. Cty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020).  More specifically, a plaintiff pinning his hopes on *Monell* must prove three elements: (1) an official policy or custom; that (2) causes the plaintiff to be subjected; to (3) a denial of a constitutional right.  *Id.*

An official policy "includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  Policies can be "pronounced or tacit," and can take the form of "either action or inaction." *Lucente*, 980 F.3d at 297.

At bottom, the Supreme Court has sanctioned four methods of proving out a *Monell* claim:

> (1) a policy formally adopted and endorsed by the municipality;
> (2) actions taken by policymaking officials that caused the
> particular deprivation alleged; (3) practices by subordinate
> officials that are not expressly authorized but are so widespread
> and consistent that policymakers must have been aware of them;

> or (4) a failure by policymakers to train or supervise that
> amounts to "deliberate indifference" to the rights of those who
> come into contact with the inadequately trained or supervised
> municipal employees.

*Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 729 (N.D.N.Y. 2020).

McDonald specifically invokes the first pathway to *Monell* liability and he also points to evidence that he claims supports a finding of *Monell* liability under the third and fourth prongs.  But first things first.  Plaintiff begins by claiming that TPD's use of deadly force policy, a policy Troy implicitly adopts, opens the door to *Monell* liability on its face.

Under TPD's policy, "[d]ischarging a firearm at a moving vehicle is prohibited unless the officer reasonably believes that the occupant(s) of the vehicle is[/are] using or about to use deadly physical force against the officer or another person, and other available options have been exhausted."  Dkt. 26, p. 21.  Plaintiff takes issue with that language because he contends that it allows a police officer to shoot at a moving vehicle even if: (1) the only threat is the movement of the vehicle itself; and (2) the police officer could have avoided the vehicle without using force.

McDonald's first argument must be rejected.  His strange contention that there is some difference in kind between a suspect threatening

deadly force with a vehicle as opposed to threatening deadly force with some other weapon is nothing short of bizarre.  Force is force, injury is injury, and death is death.  The mechanism by which these outcomes come about does not factor into the analysis.

Neither does the law impose restrictions on what method a suspect must use to threaten a bystander or officer with death or serious injury before the officer can respond with deadly force.  *Vargo*, 331 F.3d at 36 (noting that it is reasonable for police officer to use deadly force if but only if there exists threat of serious injury or death to officer or others without specifying how that force can come about).  Accordingly, there is no reason to saddle municipalities with those restrictions in setting their own use of force policies.[6]

However, while McDonald's first overt policy argument is flawed, his second is outright mistaken.  Plaintiff argues that TPD's policy permits an officer to use deadly force even if he could have simply avoided the threatened harm, but that policy does nothing of the sort.  Once again, TPD's deadly force policy permits firing on a moving vehicle only if

---

[6] In defense of his reading, plaintiff points to a report by the New York State Office of the Attorney General raising concerns as to the propriety of TPD's policy on this exact point.  Dkt. 26, pp. 18-19.  The Court expresses no opinion as to that report.  Instead, it merely posits that given the policy's requirement that police officers exhaust all other options before resorting to deadly force, the absence of an additional requirement that the driver use some weapon other than a moving vehicle does not amount to TPD's policy authorizing unconstitutional uses of force.  Dkt. 26, p. 21

there is a threat of imminent use of deadly physical force by an occupant and "*other available options have been exhausted*." Dkt. 26, p. 21 (emphasis added).

McDonald makes no effort to explain why simply stepping out of the way would not have been an "other available option," and by extension why TPD's policy would not have required Iler to have stepped out of the way before opening fire if he could have. Dkt. 26, p. 21. In the absence of some reason that TPD's catchall "other available options" language is not enough to prevent an officer from choosing shooting over avoidance, the simple fact that the policy does not explicitly spell out that an officer must get out of the way of a vehicle if he can instead of shooting at it is not enough to open Troy to *Monell* liability on its own. As a whole, plaintiff has failed to demonstrate that the City's policy specifically allows for a constitutional violation and thus the first road to *Monell* liability is closed to him.

However, McDonald's *Monell* arguments are not exhausted just yet. Next, plaintiff seems to attack the sufficiency of TPD's training. Specifically, plaintiff points to Furciniti's testimony that he could not recall any training program that referenced a specific prior incident in which a City police officer fatally shot a suspect in a vehicle on the basis that the suspect posed a threat. Dkt. 22-4, p. 191.

26

That showing cannot be enough to establish that Troy's training of its police force was so deficient as to open it to liability under *Monell*, and for three reasons.  First, simply because Furciniti did not remember that specific incident being mentioned does not establish that it never was.  Second, even if it were never mentioned, that silence by itself does not amount to a failure to train if the City nevertheless specifically trained on the issues raised by the incident, namely when police can shoot on a moving vehicle.  Third, and relatedly, plaintiff has conceded that the City held training specifically on the use of firearms in motor vehicle engagements in the Spring of 2017.  DSMF ¶ 163.  Given those three sizeable holes in McDonald's failure to train argument, that argument must also be rejected.

Finally, McDonald appears to argue that TPD's problems with excessive force are so pervasive and widespread as to have the tacit approval of Troy itself.  In support, plaintiff cites to eight settlements by the City concerning excessive force since 2013, with two more excessive force cases remaining active.  Plaintiff also cites to another ongoing case by an African American police officer bringing a claim against the City for allegedly discriminatory employment practices.

Not one of the cases that McDonald identifies has as of yet resulted in a finding by a judge or a jury that a Troy police officer used excessive

force or that the City itself discriminated on the basis of race.  *See Simms v. City of N.Y.*, 480 F. App'x 627, 630 (2d Cir. 2012) (summary order) (noting that citation to separate action "premised on a different set of factual allegations, does not support an inference that [plaintiff's] injuries were caused by the City's failure to train its employees").

The Court acknowledges McDonald's point that eight settled lawsuits over eight years is not the best record for a small city like Troy to sport.  Even so, especially because plaintiff has not pointed to a single related case that actually resulted in a finding of liability on the City's part, that showing falls woefully short of establishing *Monell* liability.  Plaintiff has thus failed in each of his attempts to put the City on the hook and his § 1983 claims against the City must be dismissed.  *See, e.g.*, *Brown v. New York*, 2018 WL 1115680, at *3 (E.D.N.Y. Feb. 26, 2018) (dismissing *Monell* claim based on other cases against city because plaintiff did not establish "how these other actions relate to this one, what factual similarities they pose, what common policy or custom is at issue, or even whether the other lawsuits resulted in a verdict against the city").

## 2. **Plaintiff's State Law Claims**

Finally, defendants move for summary judgment against McDonald's state law claims of assault, battery, and negligence against Troy.  Defendants' motion relies on New York General Municipal Law §§ 50-h and 50-i.  Section 50-i requires a would-be plaintiff to submit a notice to the municipality before filing a lawsuit.  N.Y. GEN. MUN. LAW § 50-i(1).  The municipality then has the right to demand an examination of plaintiff's claim during a § 50-h hearing.  N.Y. GEN. MUN. LAW § 50-h(1).  If the municipality demands a § 50-h hearing, the would-be plaintiff is precluded from filing suit under New York law until he has participated in that hearing.  *Id.* at § 50-h(5).

Defendants and McDonald both agree that Troy demanded a § 50-h hearing and that plaintiff never appeared for one.  Dkt. 22-4, pp. 458-59.  The parties also agree that plaintiff requested an adjournment of the hearing and never negotiated with the City to accommodate the fact that he was incarcerated at the time of the City's demand for a hearing.  *Id.* at 459-62.  The parties similarly raise no dispute as to the fact that the City demanded that the § 50-h hearing take place at its city hall.  *Id.* at 460.  Yet the parties diverge as to what the Court is supposed to do with those admissions.

According to defendants, the Court is bound to dismiss McDonald's claims by simple operation of § 50-h(5).  However, plaintiff argues that doing so would lead to an unjust outcome and allow the City to perfectly insulate itself

from the claims of incarcerated plaintiffs.  After all, if all § 50-h hearings must take place in the City's hall, any plaintiff incarcerated for a longer period than his statute of limitations would see his claims against the City barred.

On a blank slate, McDonald's normative argument might have some force, but the tablet this Court must read from is well-etched.  Multiple departments of New York's Supreme Court, Appellate Division have repeatedly held that even if a plaintiff cannot attend a § 50-h hearing by virtue of his incarceration, he still is obligated to find a way to appear.  *See, e.g.*, *Zapata v. Cty. of Suffolk*, 806 N.Y.S.2d 597, 598 (Sup. Ct. App. Div. 2d Dep't 2005).   Should he fail to do so, his claims must be dismissed.  *See id.* (rejecting proposition that "plaintiff's incarceration constituted an exceptional circumstance excusing his failure to appear" for § 50-h hearing).  Those holdings are binding on this Court.  *Deeper Life Christian Fellowship, Inc. v. Sobol*, 948 F.2d 79, 84 (2d Cir. 1991) (noting that opinion of appellate court on state law issue is binding in absence of "other persuasive data that the highest court of the state would decide otherwise").

In that light, McDonald bore the burden of appearing for a § 50-h hearing and he never successfully rescheduled.  Dkt. 22-4, pp. 460, 462.  However strenuous his objection to the fairness of dismissing his claims might be under these circumstances, New York law is clear that dismissal is

30

warranted.  *See, e.g.*, *Gravius v. Cty. of Erie*, 925 N.Y.S.2d 732, 733-34 (Sup. Ct. App. Div. 4th Dep't 2011) (dismissing claims against municipality where plaintiff was incarcerated in Florida in facility without videoconferencing equipment because plaintiff failed to appear for § 50-h hearing).

Accordingly, defendants' motion for summary judgment must be granted as to McDonald's state law claims against Troy.[7]  *See, e.g.*, *Rodriguez v. Cty. of Suffolk*, 2014 WL 3531897, at \*7-8 (E.D.N.Y. June 30, 2014) (dismissing claims against county where plaintiff failed to request adjournment and did not take necessary steps to reschedule § 50-h hearing).  Having already granted the same for plaintiff's § 1983 claims against the City, the City must be dismissed from this case.

## V. <u>CONCLUSION</u>

What precisely was going through Iler's head on August 15, 2017 is a question with profound implications for everyone involved.  Today, the Court

---

[7] The Court reaches this conclusion against its own better judgment. To be sure, the burden to attend a § 50-h examination is plaintiff's alone to bear.  *Zapata*, 806 N.Y.S.2d at 598.  And all of New York's Appellate Divisions to have considered the question have held that incarceration affords no excuse.  *See id.*; *see also Gravius*, 925 N.Y.S.2d at 733-34.  The Court appropriately defers to this consistent legal rule in rejecting plaintiff's claim, but it would be remiss not to point out the obvious: excessive force claims like plaintiff's often come joined at the hip with that plaintiff's incarceration. The inevitable consequence of New York's precedent is that any number of plaintiffs like this one will see their state law claims against municipalities evaporate for reasons entirely beyond their control.  It also incentivizes defendants like Troy to adopt increasingly arcane requirements for attending § 50-h hearings to weed claims out for reasons entirely unrelated to their merits.  In short, the Court hopes that New York's Court of Appeals will take up this question in an appropriate case and strongly consider the inequities of the current legal landscape.

has ruled that there is no evidence to suggest that active racial bias was part of his calculations when he shot McDonald.  But whether he had enough information to justify his belief that plaintiff posed a critical danger to him is another question, and one that only a jury can answer.  In the absence of any remaining claims sounding in Equal Protection or against Troy, though, that question is the only one that remains.

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment under Federal Rule of Civil Procedure 56 is GRANTED in part and DENIED in part;

2. Defendant the City of Troy is dismissed from this case;

3. Plaintiff Dahmeek McDonald's claims under Counts: (II) Equal Protection; and (VI) negligence against defendant Jarrod Iler are dismissed;

4. Plaintiff Dahmeek McDonalds' claims under Counts: (I) excessive force; (IV) assault; and (V) battery against defendant Jarrod Iler remain for trial.

IT IS SO ORDERED.

Dated:  June 3, 2021
 Utica, New York.

David N. Hurd
U.S. District Judge